IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

CYNTHIA WILSON et al.,

      Plaintiffs,

v.                           CASE NO. 5:19cv371-RH/MJF

FEDERAL INSURANCE COMPANY,

      Defendant.

_____/

## ORDER GRANTING SUMMARY JUDGMENT IN PART

This case presents a dispute over the amount due under a homeowners insurance policy for losses caused by a hurricane. Each side has moved for summary judgment. A critical issue is the effect of two appraisal awards. Under Florida law, the appraisal panel could have resolved coverage issues, but it did not. This order holds that the awards are binding on the issues the panel considered—on loss amounts—but not on coverage issues the panel did not consider. This order addresses de novo the issues the panel did not address.

## I.  Background

Caroline P. Ireland owned a residence and 14 acres on the waterfront in Bay County, Florida. The defendant Federal Insurance Company insured the property.

The property was directly in the path of Hurricane Michael, by some measures the strongest storm ever to hit the continental United States. The storm inflicted major damage.

Ms. Ireland died of unrelated causes a few months later. Her nieces Alma Wilson Backer and Cynthia Wilson—to whom Ms. Ireland had conveyed an interest in the property apparently as an estate-planning measure—became the personal representatives of her estate. They pursued her claim under Federal's insurance policy. Federal disagreed with the amounts they claimed.

The policy called for an appraisal, but the parties disagreed on which state's law would govern the appraisal process. Ms. Backer and Ms. Wilson filed this action for a declaration on the choice-of-law issue and for other relief. After a ruling on the choice-of-law issue and other skirmishing, the parties agreed to a bifurcated appraisal process: first on losses related to structures on the insured premises, that is, losses for everything other than contents; second on losses related to contents. The litigation was stayed while the appraisals went forward.

The appraisal panel issued its awards. The plaintiffs assert the awards are binding and entitle the plaintiffs to judgment based on their terms. Federal asserts the awards include amounts not only for covered losses but for some losses that are not covered, that at least some other errors in the awards can be corrected by the court, and that parts of one award exceed the applicable policy limits for discrete

categories of coverage. Federal asserts the plaintiffs cannot recover at all on the contents claim because they refused to sit for an examination under oath and did not produce some of the requested records on that claim. Each side has moved for summary judgment on these issues.

In addition, Federal has moved for leave to amend its answer to assert a fraud defense and a counterclaim for recoupment of all amounts it previously paid. Federal says the plaintiffs intentionally misrepresented the cause or extent of damage to some items included in the contents claim and fraudulently sought recovery for some contents that were excluded from Federal's policy because they were covered by a different insurer.

Federal has moved to vacate the contents appraisal award based on the same alleged fraud.

## II.  The Effect of the Appraisal Awards

Appraisal provisions in insurance policies are commonplace. Like arbitration clauses, they are contractual in nature—the parties can make the provisions as broad or as narrow as they choose.

When, as here, an appraisal provision does not specify whether it applies only to issues related to the amount of loss or will extend also to coverage issues, the answer is provided by the law of the appropriate jurisdiction. In this case, that

means the law of Florida. The analysis supporting the conclusion that Florida law

applies is set out in the order of April 8, 2020, ECF No. 24 at 2–4.

Under Florida law, when an issue is whether an insurance policy provides

any coverage for any part of a claim or none, the coverage issue is for the court,

not the appraisers. But if there is at least some coverage for some part of the claim,

the issue of which parts of the claim are covered is for the appraisers. In other

words, coverage is for the court only when the issue is all or nothing. *See State*

*Farm Fire & Cas. Co. v. Licea*, 685 So. 2d 1285 (Fla. 1996). The Eleventh Circuit

has confirmed this is the proper reading of *Licea*. *See Three Palms Pointe, Inc. v.*

*State Farm Fire & Cas. Co*., 362 F.3d 1317 (11th Cir. 2004) (upholding an

appraisal award for relocation expense without reaching the issue of whether the

policy at issue actually covered relocation expense). The analysis supporting this

conclusion is set out at greater length in the order of August 24, 2021, ECF No. 96

at 4–5.

Here there is no dispute that a covered peril—the hurricane's winds—

damaged this property. Federal acknowledged this and paid substantial amounts on

the claim. Under *Licea* and *Three Palms*, either party could have insisted on

submitting to the appraisal panel the issue of which losses are covered. But that is

not what happened. This appraisal panel confined its inquiry to the dollar amount

of losses caused by the covered peril, without analyzing whether any specific

element of loss was within the policy's coverage. The parties acquiesced in this treatment.

The plaintiffs' insistence that the appraisal awards nonetheless settle all coverage issues makes no sense. The awards determined what they determined— no more and no less. The umpire's deposition testimony sets out with unmistakable clarity what the awards did and did not determine. The awards determined the dollar amount of losses caused by the covered peril, but not whether the loss in any category was covered or excluded by the policy. The plaintiffs are not entitled to recover elements of loss that neither the panel nor the court has determined are within the policy's coverage and that, when properly analyzed, are *not* within the policy's coverage.

Well-accepted principles of contract law support this conclusion. For contractual provisions of any kind, including for appraisal of insurance losses, the parties' practical construction of their contract sometimes controls over a contrary interpretation that might otherwise be adopted by a court. *See, e.g.*, *Reinhardt v. Reinhardt*, 131 So. 2d 509, 512–513 (Fla. 3d DCA 1961) (citing *Holmes v. Stearns Lumber & Exp. Co.*, 63 So. 449, 452 (Fla. 1913)). Moreover, the parties to an appraisal agreement, like the parties to contracts of other kinds, are free to modify their agreement, either explicitly or through their conduct. *See, e.g.*, *Beach Higher Power Corp. v. Granados*, 717 So. 2d 563, 565 (Fla. 3d DCA 1998) (recognizing

that parties may modify a contract through their conduct, even if the contract itself says it can be modified only in writing).

In this case, when these parties first presented to the court the question whether this appraisal provision extended to coverage issues, they did not address what the appraisal panel actually did and their acquiescence in it. Instead, Federal asserted that it had argued coverage to the panel, at least on the lost-rent issue, and that the panel had inexplicably resolved the issue in the plaintiffs' favor. The court record did not show the parties' practical construction or modification of their agreement. But now the record does show this. The record shows that the parties practically construed the appraisal provision or modified it through their conduct to apply only to the amount of loss caused by the covered peril, not to coverage issues. The awards determined only what they determined, leaving unresolved coverage issues for the court.

A side note: the appraisal panel's limited approach and the parties' acquiescence in it ought not be criticized. The approach may be consistent with the standard in the trade—or at least with the standard practice of some appraisers, including those involved here. Moreover, an appraiser or litigant might reasonably choose to adopt this approach and thus to avoid the uncertainty posed by *Licea* and *Three Palms*, with which some Florida intermediate appellate courts have disagreed. And regardless of the standard in the trade or governing law, litigants

might reasonably conclude that coverage issues of this kind could be resolved more reliably by a court than by an appraisal panel—and so might choose not to submit the issues to an appraisal panel. Whether deliberately or otherwise, that is the course these parties followed.

### III.  The Structures Award

A. Lost Rent

Perhaps the clearest illustration of what the appraisal awards did and did not determine comes from the structure award's treatment of lost rent.

The appraisal award put the fair rental value of the property at $100,000 per month for a period of one year, a total of $1,200,000. This is a facially reasonable amount for this property—for this residence and 14 acres on the waterfront at this location. But the insurance policy provides for payment of lost rent only if the property—or any part of it—was usually rented "to others." This property was never rented to others. The plaintiffs are not entitled to recover any amount for lost rent.

As the umpire's testimony makes clear, the appraisal award was not to the contrary. The appraisal panel did not have a copy of the insurance policy, did not consider whether the property had or had not been rented, and did not determine whether Federal was or was not obligated to pay the plaintiffs $1,200,000 for lost

rent. The determination was simply that if lost rent was recoverable, this was the recoverable amount.

Federal is entitled to summary judgment in its favor on the lost-rent issue.

B. Duplication

Federal asserts the structures award included improper duplication that can and must be corrected by the court. Thus, for example, the award included amounts to clean the house's drapes and also to replace them. The same for flooring. The record does not make completely clear that the allegedly duplicative amounts related to the same drapes and flooring—this was, after all, a large house with many drapes and lots of flooring.

The inclusion of both cleaning and replacement costs, if indeed these were for the same drapes and flooring, might have been a mistake. But it might not have been. Leaving wet drapes or flooring in place to grow toxic mold prior to their replacement might not be prudent. Attempting to clean drapes to avoid having to replace them, but then replacing them if cleaning proves unsuccessful, might be prudent and indeed more favorable to an insurer than jumping immediately to replacement. This is what the plaintiffs say happened here. *See* ECF No. 60-1 at 3. Federal's assertion that it can never be proper to clean an item that will eventually be replaced is incorrect. The record does not establish that the award was erroneous.

More fundamentally, these were issues properly within the scope of the appraisal. A court cannot vacate or ignore an appraisal award merely on the ground that it was mistaken. *See Schnurmacher Holding, Inc. v. Noriega*, 542 So. 2d 1327, 1328 (Fla. 1989) (holding an arbitration award binding even though mistaken: an award "cannot be set aside for mere errors of judgment either as to the law or as to the facts"); *A.L. Gary & Assoc., Inc. v. Travelers Indem. Co. of Conn.*, No. 08-60636-CIV, 2008 WL 11333729, at *7 (S.D. Fla. Aug. 27, 2008) (applying this principle to an appraisal award). Nothing prevented Federal from raising these issues before the appraisal panel, whose award, unless vacated on other grounds, is binding on these issues.

C. Policy Limits

In addition to lost rent, the structures award determined losses of $1,136,984.04 for the "main house," $10,005.12 for "mold remediation" for the "main house," $2,813,916.46 for "other structures," $10,000.00 for "mold remediation" for "other structures," $505,995.20 for "extended building coverages," and $569,125.00 for "incurred temporary repairs."

The award's terms—those in quotation marks in the preceding paragraph—are not identical to the terms used in the policy's description of its separate coverages. This is hardly surprising—the appraisal panel did not have a copy of the policy. Federal says the losses should be reallocated to match the policy's

coverages—or just to correct errors in the award's treatment of some losses—and that, when properly reallocated, some of the losses exceed the policy limits. Federal is correct that applying the policy limits is for the court—the panel did not undertake to do this—and that this could require reallocating any losses the panel put in the wrong category.

As relevant here, the policy has separate limits for the "house," "other permanent structures" (abbreviated in this order as "OPS"), mold remediation, and tree removal that is not otherwise covered.

### 1. House

The listed house limit is $2,142,000. ECF No. 127-1 at 50. But the policy's "payment basis" is "extended replacement cost." This increases the limit by 50%, "if necessary, for the reconstruction cost." *Id.* at 77. This effectively makes the house limit, as relevant here, $3,213,000. The award for the house, including any amounts properly allocated to the house, does not exceed this amount. Indeed, the part of the award applicable to the house does not exceed the listed limit of $2,142,000. Federal concedes that the part of the award properly allocated to the house does not exceed the policy limit.

### 2.  OPS

The policy's listed OPS limit is $2,285,800. *Id*. at 52. But again there is a

50% increase because the payment basis is extended replacement cost, effectively

making the OPS limit, as relevant here, $3,428,700. *Id*. at 77.

Federal says some of the amounts included in the award's "main house"

category should be allocated instead to the policy's OPS coverage, including, for

example, amounts awarded for the driveway and masonry walls. This is probably

correct for the driveway. *See Shelter Mut. Ins. Co v. Simmons*, 293 F. App'x 273,

275 (5th Cir. 2008) (holding that a driveway was an "other structure" under a

policy governed by Mississippi law); Int'l Risk Mgmt. Inst., Other Structures,

https://www.irmi.com/term/insurance-definitions/other-

structures#:~:text=Other%20Structures%20%E2%80%94%20homeowners%20pol

(defining OPS to include structures "separated from the dwelling by a clear space"

and including "driveway" in a list of examples). Whether this is correct for the

masonry walls depends on whether they were connected to the house, a factual

question on which the record may not be clear. *Compare* ECF No. 58-4 at 1

(setting out Federal's position that the walls were not part of the house) *with* ECF

No. 60-1 at 2 (adjuster's unsworn assertion that the walls were attached to the

house).

Federal asserts its proposed reallocations would put the OPS award above the policy's listed OPS limit of $2,285,800. But the reallocations plainly would *not* put the OPS award about the extended-replacement-cost limit of $3,428,700. The reallocations thus would make no difference. The award does not exceed the OPS limit.

### 3. Mold Remediation

The mold remediation limit is "$10,000 for each occurrence." ECF No. 127-1 at 52. Hurricane Michael was a single occurrence. The structures award includes $20,005.12 for mold remediation, allocated $10,005.12 to the main house and $10,000 to other structures. As the plaintiffs apparently concede, they are entitled to recover only $10,000 for mold remediation. The remaining $10,005.12 in mold remediation expense is not recoverable.

### 4. Tree Removal

The policy, which refers to Federal as "we" and the insured as "you," provides: "Unless covered elsewhere under this policy, we will pay the reasonable expenses you incur up to a total of $1,000 for each occurrence to remove trees fallen due to wind, hail, sleet or the weight of ice or snow." *Id*. at 80. Hurricane Michael was a single occurrence, so the limit for tree removal under this provision is $1,000, unless greater coverage is provided elsewhere in the policy.

The policy includes landscaping coverage that applies to trees and has a limit of $10,000 per tree, but the provision does not apply to losses caused by wind and so is inapplicable here.

The policy covers debris removal with a limit of 30% of the house limit before application of the extended-replacement-cost increase. *Id*. at 81. So the debris limit is $642,600—more than enough to cover the cost of removing all the fallen trees. But only some, not all, fallen trees are within the debris coverage.

The debris provision states: "We cover the reasonable expenses you incur to remove debris [1] of a covered loss and [2] of the property that caused a covered loss." *Id*. at 81 (bracketing added). A "covered loss," as applicable here, is a loss to the house or other permanent structure. *See id*. at 77 (providing for payment of "reconstruction cost"); *id*. at 76 (defining "reconstruction cost" as the lesser of the cost to repair, replace, or rebuild "your house or any other permanent structure"). A tree is not itself a house or other permanent structure, so a fallen tree is not "debris of a covered loss" within clause [1] of the debris provision. A fallen tree is "property that caused a covered loss" within clause [2] only if the tree fell on—that is, caused a physical loss to—the house or other permanent structure. The debris provision does not apply to trees that fell, and stayed on, unimproved land.

Federal agrees with this analysis. The plaintiffs apparently disagree only for trees that blocked access to the site of the house or other permanent structure and

whose removal therefore was necessary to repair, replace, or rebuild the structure. That assertion implicates a different coverage—the policy's coverage of the house and other permanent structures. Because "reconstruction cost" includes the cost to repair, replace, or rebuild the house and other permanent structures, any tree removal that is part of that cost—including any removal that is necessary to allow repair, replacement, or rebuilding—is covered not just under the tree-removal provision but "elsewhere in this policy." Any such tree removal thus is not subject to the $1,000 tree-removal limit.

The structures award does not separately identify amounts awarded for tree removal. Federal says the award included $289,606 for debris removal and that it paid $261,645; Federal apparently asserts the difference of $17,961 is attributable to uncovered tree removal in excess of the $1,000 limit. The plaintiffs apparently agree that the award included $17,960.60 for uncovered tree-removal expense. The $0.40 difference is apparently a rounding error. The record thus establishes, without genuine dispute, that the award includes $17,960.60 in unrecoverable tree-removal expense, and that no further reduction for tree-removal expense is in order.

D. Expenses Not Yet Incurred

Property insurance policies can provide for payment on various grounds. The most common are actual cash value and replacement cost. Actual cash value is

net of depreciation, so, for example, a house that would cost $200,000 to rebuild might be worth 10% less than that amount, or $180,000. Replacement cost, in contrast, would be the full $200,000.

It is commonplace for policies that cover replacement cost to provide that the amount that exceeds actual cash value—$20,000 in our hypothetical—is payable only after the cost is actually incurred, that is, only after the structure at issue is in fact repaired, replaced, or rebuilt. So, in our example, the insurer might be obligated to pay only $180,000 until the insured actually incurs greater expense to rebuild, up to the full $200,000.

Federal asserts this policy works that way—that some amounts included in the award will not be payable until actually incurred. Federal says this is so for amounts it says were included in the structures award as "placeholders" for expenses that will be incurred during the process of rebuilding. Federal says it will "pay these costs if, and when, they are incurred." ECF No. 127 at 8.

The flaw in the argument is that this policy, unlike many others, does not provide that replacement cost in excess of actual cash value is payable only when the cost is incurred. The payment basis under the policy is "extended replacement cost." ECF No. 127-1 at 77. The policy explicitly indicates what this means: "If the payment basis is extended replacement cost, we will pay the reconstruction cost." *Id*. This is a defined term: "'Reconstruction cost' means the lesser of the amount

required *at the time of loss* to repair, replace, or rebuild, at the same location, your house or any other permanent structure, using like design, and material and workmanship of comparable kind and quality." *Id*. at 76 (emphasis added). To underscore this, the policy provides there will be no deduction for depreciation or other specified amounts. *Id*. at 76–77. The policy does *not* say Federal will pay the "reconstruction cost," or any part of it, only when the house or other permanent structure is repaired, rebuilt, or replaced.

Federal says, though, that in discussing a different payment basis, "verified replacement cost," the policy explicitly addresses whether replacement cost must actually be incurred: "If the payment basis is verified replacement cost, we will pay the reconstruction cost of . . . your house . . . and other permanent structures . . . *whether or not you actually repair, replace, or rebuild*." *Id*. at 77 (emphasis added). Federal says the policy would have said the same thing for extended replacement cost—the payment basis involved here—if the intent was the same. But the assertion ignores the plain language and structure of the policy.

First, nothing in the policy says that when the payment basis is extended replacement cost, the insured must "actually repair, replace, or rebuild" as a prerequisite to recovering reconstruction cost. An insurer who wishes to impose such a limitation must say so. It is not enough that a different, inapplicable provision explicitly excludes such a limitation.

Second, "extended replacement cost" is the policy's superior coverage—the superior coverage Ms. Ireland paid for and Federal agreed to provide. The superior coverage provides greater benefits, including the 50% increase in limits noted above, and comes with a greater obligation to keep the property fully insured, not just insured at 90% of value as required for verified replacement cost. *Id*. at 77. Federal has it backwards when it asserts the policy provides greater replacement-cost benefits when the payment basis is verified replacement cost than when the payment basis is extended replacement cost.

Under the policy's plain language, the plaintiffs are entitled to recover replacement cost now. There is no requirement to repair, replace, or rebuild before recovering the full amount of the loss as properly calculated based on replacement cost.

Federal has proffered no evidence that the amounts included in the award, including the amounts it denigrates as "placeholders," are not reasonable determinations of amounts the plaintiffs will have to incur to repair, replace, or rebuild. Determining these amounts was the role of the appraisal panel, whose determination is now binding.

## IV. Contents Award

The plaintiffs say they are entitled to recover the full amount of the contents appraisal award. Federal disagrees on three grounds.

First, Federal says the plaintiff's amended complaint—the operative pleading—does not assert a contents claim. But it does. The amended complaint, which sometimes refers to the contents appraisal as the "phase two" appraisal, demands "ancillary relief necessary to afford complete relief," including, after completion of the phase two appraisal, "judgment on the phase two appraisal award (if any)." ECF No. 66 at 3 ¶ 5; *see also id*. at 29 (demanding "judgment following appraisal confirming the award and compelling its payment"). Proceeding in this manner is unobjectionable. Indeed, it happens frequently in cases of this kind that the sequence is (1) filing of the complaint, (2) appraisal, and (3) entry of judgment based on the appraisal.

Second, Federal says the award included loss amounts for some items that were not damaged by the hurricane, or that had preexisting damage improperly treated as caused by the hurricane, or that could have been cleaned or repaired but were treated as a total loss. This is an assertion that the appraisal panel made mistakes. But as set out above, a court cannot set aside an appraisal award on the ground that it is mistaken. *See supra* at 9. Evaluating these contentions was the province of the appraisal panel. Whether, as Federal contends, the award should be set aside on other grounds—failure to submit to a requested examination under oath, or to produce documents, or fraud—is a separate question addressed below.

Third, Federal invokes the policy's exclusion for personal property "insured on a blanket basis under a personal articles floater policy or similar policy." ECF No. 127-1 at 95. As is undisputed, Ms. Ireland was insured under such a policy—a "fine art personal blanket" policy issued by Ironshore Indemnity Inc. The plaintiffs are not entitled to recover for loss to articles insured under the Ironshore policy.

In resisting application of this exclusion, the plaintiffs say they are not seeking a double recovery. But that misses the point. The plaintiffs are not entitled to recover from Federal for any article covered under the Ironshore policy. This is so regardless of whether the plaintiffs recovered from Ironshore or even whether they asserted a claim against Ironshore. What matters is whether an article was covered by Ironshore, not whether any award against Federal would effect a double recovery.

In sum, the contents award must be reduced by only the amount awarded for items insured by Ironshore.

### V.  Affirmative Defense: Policy Conditions

The policy's liability coverage, which is *not* at issue here, imposes on the insured an explicit duty to cooperate with Federal in the defense of any claim against the insured. The policy's property coverage, which *is* at issue here, does not explicitly impose a general duty to cooperate. But the property coverage does come with conditions addressing examinations under oath and document

production. Federal asserts as an affirmative defense that the plaintiffs failed to comply with these conditions.

A. Policy Terms

Three provisions set out the insured's duty to provide information.

First, the policy requires "you" to submit a sworn proof of loss "providing all information and documentation we request such as the cause of loss, inventories, receipts, repair estimates and other similar records." ECF No. 127-1 at 126.

Second, the policy allows Federal to "ask you . . . to produce all records and documents we request and permit us to make copies." *Id*. This language does not explicitly require a document request to be relevant to a claim and reasonable, but the language should be so construed, a view consistent with the implied covenant of good faith. *See, e.g.*, *De Leon v. Great Am. Assurance Co.*, 78 So. 3d 585 (Fla. 3d DCA 2011) (holding an insured was completely justified in refusing to answer impertinent EUO questions).

Third, the policy allows Federal "to examine separately under oath as often as we may reasonably require you, family members and any other members of your household and have them subscribe the same." ECF No. 127-1 at 126.

The policy defines "you" as "the person named in the Coverage Summary, and a spouse who lives with that person." The person named in the coverage

summary is Ms. Ireland. *Id*. at 50. She had no spouse. The plaintiffs are her personal representatives. This order assumes they had the same duty to produce documents and appear for EUOs as Ms. Ireland would have had.

B. Chronology

Federal requested contents-related documents at the outset and eventually agreed to an order specifying the documents the plaintiffs were required to produce prior to the contents appraisal. Federal acknowledged that the plaintiffs complied with the order, and the contents claim went to appraisal on that basis. Federal now says the plaintiffs should have produced more.

Federal did not request EUOs when the claim was submitted, when the lawsuit was filed, when the parties agreed to a bifurcated appraisal schedule, or when the appraisals commenced. Shortly before the contents award was expected, Federal asked for EUOs for the first time. Federal limited the request to the contents claim.

The chronology confirms just how late in the process it was when Federal requested EUOs and additional documents. Hurricane Michael made landfall and damaged the property on October 10, 2018. On May 1, 2019, having been unable to reach agreement with Federal on the recoverable amount, the plaintiffs requested an appraisal. ECF No. 29-2. On May 17, 2019, Federal denied the request, saying its investigation was ongoing. ECF No. 29-4. Federal asked for a

sworn proof of loss and documentation, including an inventory and "[a]ny documents that support your claim for damaged contents." *Id*. at 4. Federal did not ask for EUOs and has identified nothing it asked for at that time that the plaintiffs did not provide prior to appraisal.

The plaintiffs filed this lawsuit on October 1, 2019. By order dated December 30, 2019, the discovery deadline was set for May 15, 2020, and the trial was set for August 3, 2020.

On February 3, 2020, the plaintiffs moved for summary judgment on the choice-of-law issue. Federal asked for and received an extension of the deadline to respond, and Federal responded by the extended deadline. On April 8, 2020, an order was entered determining that Florida law would apply to any appraisal.

On May 31, 2020, an agreed order was entered with exactly the terms proposed by the parties. The order stayed the litigation pending appraisal. The order required the plaintiffs to produce within 15 days, that is, by June 15, all unprivileged documents in their possession that were requested in prior letters, including documents in listed categories. The category specifically addressing contents was an "inventory of contents that are being claimed as damaged as part of this loss, along with an estimated valued of said items." ECF No. 26 at 2. More general categories that may have dealt with contents as well as structures included engineering or expert reports "addressing the nature or cause" of claimed damage,

reports "prepared by or on behalf of the insured under the policy which speak to

the condition of the subject property prior to the date of loss," estimates of the loss,

photographs or videos of the "subject property" prior to the date of loss, and any

updated or amended proof of loss. *Id*.

   The order set October 15, 2020 as the deadline to complete the appraisal and

enter an award. The order did not provide for EUOs; Federal had not asked for any.

By that point, Federal had had 18 months to evaluate the loss and five months to

conduct the full array of discovery available under the Federal Rules of Civil

Procedure.

   On August 13, 2020, Federal filed a motion to limit the scope of the

appraisal. The motion asserted that appraisal of the contents portion of the claim

was inappropriate because the plaintiffs had not provided requested documents and

Federal thus had "not had the opportunity to investigate and adjust" that portion of

the claim. ECF No. 29 at 2. The plaintiffs obtained an extension of the deadline to

respond to the motion so that the parties could attempt to agree on the matter, and

the parties eventually agreed.

   On October 6, 2020, an agreed order was entered in exactly the form

proposed by the parties. ECF No. 39. The order bifurcated the appraisal process

into phases I and II—into what have also been referred to as the structures

appraisal and the contents appraisal. The order recounted that Federal had

requested and would be allowed to conduct an additional inspection of the

contents. The order required the plaintiffs to produce to Federal within 15 days,

that is, by October 21, 2020, unprivileged documents in their possession that had

not already been produced "that backup or support the damages or value for any of

the [contents] claimed." *Id*. at 3. The order did not mention, and Federal did not

request, EUOs.

The October 6 order provided that Federal would have until November 18,

2020 "to evaluate any potential loss concerning [contents] and provide its position

on the same and any payments owed to the [plaintiffs] within that time frame." *Id*.

at 3. The order provided that if, after Federal's evaluation, either party disputed the

amount recoverable on the contents claim, a demand for appraisal would be

presented to the other party by November 25, 2020. The order provided that any

contents appraisal would be completed by December 18, 2020. *Id*. at 3.

On November 18, 2020, the deadline for Federal to provide its contents

position, Federal moved to extend the deadline by 30 days. The motion

acknowledged that the plaintiffs had produced the required documentation by the

October 21 deadline. ECF No. 43 at 3. The motion said that, despite working

diligently, Federal's "team and expert consultant" had been unable to complete

their evaluation by the November 18 deadline. *Id*. at 3. In response to the plaintiffs'

opposition, Federal said the requested 30-day extension would "allow [Federal] to

complete its investigation of this portion of the claim and provide its position with respect to coverage and payment." ECF No. 49 at 1. Federal did not suggest the team and expert consultant needed anything further from the plaintiffs and did not mention EUOs, which Federal still had not requested.

On December 4, 2020, an order was entered extending Federal's deadline to advise the plaintiffs of its contents position to December 18, 2020, extending the deadline to demand a contents appraisal to December 23, 2020, and extending the deadline to complete the contents appraisal and enter an award to January 22, 2021. ECF No. 51. This was the full extension Federal requested.

On the December 18 deadline, Federal advised the plaintiffs of its contents position. Federal said its consultant "had reviewed the items claimed" and determined their value. ECF No. 66-3 at 4. Federal put the value at substantially less than the plaintiffs claimed. Federal took the unfounded position that the plaintiffs could recover some contents-related expenses only after the plaintiffs paid the expenses, and Federal asked for documentation of any such payments. Federal asked for no other documentation and did not request EUOs.

The plaintiffs disagreed with Federal's position on the recoverable contents loss, and the dispute proceeded to appraisal.

The deadline for a contents award was January 22, but the appraisal panel said it needed 90 more days. On February 4, 2021, the parties moved jointly to

extend the deadline. On February 5, the motion was granted, and the deadline was extended by 90 days, to April 22, 2021. Federal again did not assert *it* needed more time or that the plaintiffs had failed to provide any requested documentation. Federal did not say it needed or wished to conduct EUOs.

Federal asked for EUOs for the first time by letter dated March 2, 2021. The letter requested that the EUOs occur on March 24, 2021. The letter said the two plaintiffs would be examined sequentially, with neither present for the other's examination. The letter asked for production by March 19 of a broad array of documents, much broader than required by the October 6, 2020 agreed order, including all documents "that support or concern" the contents claim. ECF No. 78-2 at 3. The letter offered to move the EUO to a different date for the plaintiffs' convenience.

The plaintiffs apparently responded to the EUO request through telephone calls on March 8 and 24 and by letter dated March 30, 2021. The plaintiffs asserted the policy's EUO requirement applies only before the filing of a lawsuit. No attempt was made to conduct the EUOs on Federal's requested date, March 24, and no decision was made whether EUOs would or would not occur at some later date. The issue lay dormant for a period, perhaps because Federal was changing attorneys.

On April 15, 2021, Federal's appraiser said Federal's expert's "content package"—apparently Federal's complete presentation to the panel—would be provided within "the next couple of days." ECF No. 69-1 at 2. The appraiser did not say Federal needed anything more and did not mention EUOs. Federal soon submitted its package as promised.

On April 22, 2021, Federal again moved to extend the deadline for the contents appraisal award, this time at the umpire's request. The umpire said an extension was needed because he was moving and the plaintiffs' appraiser was recovering from covid-19. ECF No. 69-3 at 1. Federal said its own appraiser had been dealing with a family member's covid-19. ECF No. 69 at 2. Federal did not assert it needed more documentation—or that the panel did—and did not mention EUOs. The plaintiffs objected to an extension.

On April 23, the umpire advised the panel he had received "all the information" and did not need a 30-day extension as previously suggested. Federal did not withdraw its motion for an extension and may not have known the umpire had changed his position. Nobody advised the court of the change. By order dated April 26, 2021, the deadline for the contents award was extended to May 23, 2021.

On May 3, 2021, Federal, now acting through its new attorney, sent an email "following up" on the prior EUO request and asking the plaintiffs' availability on May 13 or 14. ECF No. 78-3 at 8. The plaintiffs responded by email the same day.

The email promised to provide the plaintiffs' position "as soon as possible,"
indicated May 13 and 14 would not work, and asked for dates the next week, that
is, during the week of May 17. *Id.* at 6.

Two hours later, Federal's appraiser sent an email to the appraisal panel
saying unequivocally that Federal was "going to be taking an EUO." ECF No. 79-1
at 2. The appraiser said the EUO would seek "information related to the contents to
ascertain how the contents were handled from the loss event, have all the contents
been viewed at all potential locations they may be at, and is there any duplication
of contents between the two different content policies." *Id.* The appraiser said he
was "not sure what other potential issues there may be if any." *Id.*

By email later the same day—promptly after learning of Federal's
appraiser's email—the plaintiffs objected to any delay of the appraisal based on the
request for EUOs. The plaintiffs asked Federal to indicate whether it was seeking a
delay. ECF No. 78-3 at 5. Federal responded on May 4 that it might indeed request
a delay if the plaintiffs did not promptly indicate whether they would sit for EUOs.
*Id.* at 4. Federal did *not* promise not to seek a delay, even if the plaintiffs *did*
appear promptly for EUOs. *Id.* Federal asked for an EUO response "by close of
business today," and asked the plaintiffs to produce "all documents relating to the
. . . contents claim, including documentation related to any fine art." *Id.*

In its May 4 email, Federal asked for a telephone conference on May 5 to discuss the EUO issue. The plaintiffs agreed. At the conference, the plaintiffs said they had not decided whether to sit for EUOs. The record does not indicate what if anything was discussed about document production.

On May 6, Federal moved to compel EUOs and production of previously requested documents "relating to" the contents claim. ECF No. 78 at 6. Federal asked alternatively for an order authorizing discovery. Federal said it requested the EUOs

> to answer questions about the contents being claimed, including but not limited to questions about specific information about the contents themselves, how the contents were handled following the loss, where the contents were located at the time of the loss, the age and pre-loss condition of the contents, the damage as a result of the loss, and whether any of the contents being appraised have also been claimed under another insurance policy.

ECF No. 78 at 6–7. This was one of several motions then pending, with briefing not complete until late June.

On July 7, 2021, before a ruling on the pending motions, the panel issued its contents award. An order on the motions was issued on August 24, 2021. The order denied Federal's motion to compel EUOs or document production but explicitly made "no ruling" on Federal's affirmative defense that the plaintiffs could not recover because they failed to comply with Federal's requests. The order

authorized discovery "on issues not resolved by the appraisal awards." ECF No. 96 at 8.

C.  The Plaintiffs' Obligation

Florida law is settled that an EUO provision of this kind is valid and enforceable—that an insured's failure to comply may defeat a claim. *See, e.g.*, *Stringer v. Fireman's Fund Ins. Co.*, 622 So. 2d 145 (Fla. 3d DCA 1993); *Laine v. Allstate Ins. Co.*, 355 F. Supp. 2d 1303 (N.D. Fla. 2005). The same is true for failure to produce properly requested documents.

The plaintiffs say they are nonetheless entitled to summary judgment on the EUO issue, because, they say, an insured need not appear for an EUO first requested after the insured files suit. That is wrong, as shown by this policy's language, the governing caselaw, and sound analysis of how this process should work.

First, the policy allows Federal to conduct EUOs "as often as we may reasonably require." ECF No. 127-1 at 126. Nothing in this provision or elsewhere in the policy suggests Federal's right to do this ends when the insured files suit. The request must, however, be reasonable, as the EUO provision explicitly provides. A post-filing request, like a pre-filing request, may be reasonable.

Second, courts have enforced an insurer's right to an EUO even when first requested after suit was filed. *See, e.g.*, *Biscayne Cove Condo. Ass'n v. QBE Ins.*

*Corp.*, 971 F. Supp. 2d 1121 (S.D. Fla. 2013). For their contrary assertion, the plaintiffs cite *Willis v. Huff*, 736 So. 2d 1272 (Fla. 4th DCA 1999), but that decision supports Federal, not the plaintiffs, on this issue. In *Willis*, the insured filed suit more than two years after a covered event, and the insurer requested an EUO only after suit was filed. The trial court granted summary judgment for the insurer based on the insured's failure to appear for the requested EUO. The Fourth District reversed, but not because the EUO request came too late. Quite the contrary, the Fourth District held that the insured was obligated to appear for an EUO. The Fourth District reversed only because, when it became apparent at the summary-judgment hearing that the trial court believed the EUO request was proper, the insured offered to appear. The Fourth District held that the insured should have been given an opportunity to do so at that time; the case was remanded so the insured could be given that opportunity. The plaintiffs here have cited no case holding that an insurer's right to an EUO ends when suit is filed, and I am aware of none.

Third, a holding that an EUO is required only when requested before suit is filed would create undesirable incentives—in effect, a race to the courthouse (for an insured) or to an EUO (for an insurer). The incentives against cooperation in this field are strong enough already, as are the motivations attending EUO requests. *See Whistler's Park, Inc. v. Fla. Ins. Guar. Ass'n*, 90 So. 3d 841, 845

(Fla. 5th DCA 2012) (noting that EUO forfeiture decisions "have led to a cottage industry of EUO litigation"). The timing of an insurer's investigation, on the one hand, and of an insured's filing of suit, on the other hand, should turn on other considerations—not on an arbitrary rule that an EUO request must come before suit is filed.

In sum, on whether the plaintiffs were obligated to appear for EUOs, the critical question is not whether Federal made the request before or after the plaintiffs filed this action. The critical question is whether Federal's request was reasonable. Had Federal requested EUOs when the plaintiffs filed suit or at any time before the appraisal process began, the plaintiffs would have been obligated to comply, and their failure to do so might well have entitled Federal to summary judgment.

But that is not what happened. Instead, Federal requested an EUO only very late in the process, with an appraisal award imminent. That is an important factor in the reasonableness analysis.

Similarly, on whether the plaintiffs were obligated to produce documents sooner than or in addition to what was provided, the critical question is whether the production was reasonably requested. The timing of any request for more than the plaintiffs had already produced—and more than Federal had agreed to accept—is an important factor in the analysis.

D. Whether the Plaintiffs Failed to Appear for EUOs

Federal plainly, if belatedly, requested EUOs. But a date certain was not set, and the plaintiffs thus never failed to appear for a *scheduled* EUO. Whether the plaintiffs refused to appear at all, making scheduling of a date certain irrelevant, is unclear.

To be sure, the plaintiffs dawdled when Federal asked for their position. But Federal had waited roughly two years before asking for EUOs. Its demand for the plaintiffs' position "by close of business today," ECF No. 78-3 at 4, might be thought unreasonable.

Moreover, the issue of whether the plaintiffs were obligated to appear at that late date was—and still is—unsettled. Under these circumstances, the plaintiffs' failure to respond more quickly could be viewed as tantamount to a refusal but also could be viewed as a reasonable request for time to decide.

Whether the plaintiffs failed to appear for EUOs is a genuine factual dispute. *See Haiman v. Fed. Ins. Co.*, 798 So. 2d 811, 812 (Fla. 4th DCA 2001) (holding that a factual issue for the jury exists where the insured cooperates to some degree or provides an explanation for its noncompliance). Neither side is entitled to summary judgment on this issue.

E.  Prejudice

Florida law is not entirely clear on whether failure to appear for an EUO

provides a defense only if the failure causes prejudice to the insurer and, if so,

which side has the burden of proof on the issue. *Compare Goldman v. State Farm*

*Fire Gen. Ins. Co.*, 660 So. 2d 300, 306 (Fla. 4th DCA 1995) (holding that an EUO

was "a condition precedent to suit" and that the insured's failure to comply

"preclude[d] an action on the policy regardless of a showing of prejudice by the

insurer"), *with Whistler's Park, Inc. v. Fla. Guar. Ass'n*, 90 So. 3d 841, 845–46

(Fla. 5th DCA 2012) (holding the insurer must show prejudice), *and Willis v. Huff*,

736 So. 2d 1272, 1274 (Fla. 4th DCA 1999) (distinguishing *Goldman* on the

ground that an EUO is a condition precedent only if requested prior to suit). *See*

*also State Farm Mut. Auto Ins. Co. v. Curran*, 135 So. 3d 1071, 1076-80 (Fla.

2014) (plurality opinion) (stating that an insured's submission to a medical

examination as required by the policy is not a condition precedent and thus

precludes recovery only if the insurer proves actual prejudice); *Garden-Aire Vill. S.*

*Condo. Ass'n v. QBE Ins. Corp.*, 591 F. App'x 868, 871 (11th Cir. 2014) (citing

Florida decisions on both sides of the question whether prejudice is an element of

an insurer's defense alleging failure to comply with the policy).

The better view is that prejudice is an element of an insurer's defense based

on failure to appear for an EUO, at least when an EUO is first requested after a

lawsuit is filed. If, as *Goldman* said, this turns on whether appearance for an EUO is a condition precedent, the proper treatment of a post-suit request is clear: compliance could not be a condition precedent to suit, because appearance was not required prior to suit. Moreover, there is no reason to treat failure to appear for an EUO, as required by the governing insurance policy, differently from failure to submit to an equally required medical examination, the issue addressed in *Curran*. The same is true for a failure to produce properly requested documents. *See Depositors Ins. Co. v. CC & C of Lake Mary, LLC*, 172 So. 3d 888, 891 (Fla. 5th DCA 2015) (following the *Curran* plurality opinion and requiring an insurer to show prejudice for a defense based on an insured's failure to take action after the policy became effective).

The plaintiffs' failure to appear for the requested EUOs, if indeed they failed to appear, and failure to produce properly requested documents, if indeed that occurred, might or might not have caused prejudice to Federal. Both sides had hired experts to evaluate the contents, and their analyses had been provided to the appraisal panel. The contents had belonged to Ms. Ireland, not to the plaintiffs, who might or might not have had meaningful knowledge about the contents. The plaintiffs probably would, however, have had pertinent information about the claim.

Perhaps the plaintiffs could have provided information at their EUOs, or perhaps they had possession of requested documents, that would have changed the appraisal panel's analysis. But that is not at all clear. The record does not show what further pertinent information the plaintiffs possessed or what they would have said, partly because Federal chose not to depose them. The record does not indicate whether an EUO would have made any difference, even if conducted before the appraisal panel reached its decision.

Whether the absence of EUOs or any failure to produce requested documents caused prejudice to Federal is a genuine factual dispute. Neither side is entitled to summary judgment on this issue. As suggested by *Curran*, Federal will have the burden of proof on this issue at trial.

F.  Opportunity to Cure

At least one Florida court has held that an insured whose obligation to appear for an EUO is unclear, and who is later held to have breached the policy by failing to appear, must be given an opportunity to cure the breach. *See Willis v. Huff*, 736 So. 2d 1272, 1274 (Fla. 4th DCA 1999); *see also Riviera S. Apartments, Inc. v. QBE Ins. Corp.*, No. 07-60934-CIV, 2007 WL 2506682, at *5 (S.D. Fla. Aug. 30, 2007) (recognizing that *Willis* provides support "for the general conclusion that an insured should be given an opportunity to comply with requests for examinations under oath."). This order requires the attorneys to confer on the

overall schedule going forward. The conference should also address whether

Federal still wishes to conduct EUOs and whether the plaintiffs will now appear

for them.

VI. Fraud

Federal says the plaintiffs committed fraud both by (1) including in their

claim items that were covered under the Ironshore policy and that were therefore

excluded under Federal's policy and (2) misrepresenting the extent of hurricane

damage to various items, including 49 not covered by the Ironshore policy. Federal

has filed two motions raising the fraud issue: first, a motion to vacate the contents

appraisal award, and second, a motion for leave to amend Federal's answer to

include a new affirmative defense and counterclaim. The affirmative defense

asserts Federal cannot recover at all, even for structures damage unrelated to any

fraud. The counterclaim seeks to recoup all prior payments, including those for

structures damage unrelated to any fraud.

A. Items Covered by Ironshore

Federal's principal complaint is that the plaintiffs' claim included items

covered by the Ironshore policy. Federal's policy excluded coverage of those

items. Federal has not established, though, that the plaintiffs committed fraud in

this respect.

First, the plaintiffs never denied the existence of the Ironshore policy. They never denied that any item covered by the Ironshore was indeed covered by the Ironshore policy. Federal knew about the Ironshore policy at least as early as March 15, 2019, when the plaintiffs' public adjuster sent Federal's adjuster an email identifying Ironshore as the fine-arts insurer and providing its claim number and contact information. ECF No. 136-1 at 2. The plaintiffs' submission of a claim including items covered by the Ironshore policy thus could not have misled Federal, which knew of the exclusion in its own policy and was at least as capable as the plaintiffs of determining which items were covered by the Ironshore policy. Federal has not identified a false statement at all, let alone a *material* false statement—one that Federal would reasonably take into account given its superior knowledge of its own exclusion.

Moreover, as this order makes clear, any misrepresentation about items covered by the Ironshore policy made no difference, because Federal refused to pay any part of the claim excluded by the Ironshore policy, and Federal's position has been upheld. Any misstatement about whether any given items were covered by the Ironshore policy—Federal has alleged none—did not cause Federal to pay losses for those items. Nor could any such misrepresentation have affected the appraisal panel, which did not consider coverage issues of this kind. That the award includes losses for items covered by the Ironshore policy is of no

consequence, because any judgment for the plaintiffs will exclude that part of the award.

### B. Other items

Federal says the plaintiffs misrepresented the extent of hurricane damage to 49 other items—items not covered by the Ironshore policy. Federal bases the assertion on the disparity between the plaintiffs' claim as submitted to Federal and notes apparently made by an expert retained by the plaintiffs to evaluate the items. The plaintiffs say these were preliminary, unreliable notes.

It is a stretch to assert that the plaintiffs must have believed the notes—if they even knew about them—or that any statement at odds with the notes was willfully false. But the plaintiffs have submitted no evidence explaining the disparity. If, as Federal asserts, the plaintiffs willfully concealed preexisting damage to some items or the extent of damage to others, they may have committed fraud. This record presents a genuine dispute of material fact on this issue.

### C. The Proposed Answer and Counterclaim

The genuine dispute over whether the plaintiffs committed fraud does not mean Federal should be allowed, at this late date, to amend its answer to assert a fraud defense and counterclaim. Federal says it acted as soon as it had the ability to subpoena nonparties and thus to learn of the fraud. That is not so.

The plaintiffs filed this action on October 1, 2019. Federal answered on November 6, 2019. Discovery opened by December 2, 2019. *See* ECF No. 10 at 1 (confirming that the Federal Rule of Civil Procedure 26(f) attorney conference occurred that day); Order of Nov. 7, 2019, ECF No. 6 at 1–2 (allowing discovery to begin without delay). Discovery was open until the case was stayed pending appraisal on May 31, 2020. ECF No. 26. The full array of discovery under the Federal Rules of Civil Procedure, including the ability to subpoena nonparties, was available to Federal from December 2, 2019 to May 31, 2020—for six months less one day.

Federal chose, for reasons of its own, not to subpoena nonparties during that six-month period, even though Federal had roughly the same grounds for doing so during that period as later. And even after the appraisals were completed, Federal acted only slowly, serving subpoenas returnable after the discovery deadline.

Federal moved for leave to amend on December 17, 2021, more than three years after the hurricane and more than two years after this action was filed. The deadline to amend pleadings, based on the court's order accepting the parties' proposed deadline, was January 30, 2020. *See* ECF No. 10 at 3 (joint scheduling report proposing this deadline); ECF No. 11 at 2 (order adopting the proposal).

A party who moves for leave to amend after the deadline must show good cause for the belated filing. *See, e.g.*, *Smith v. Sch. Bd. of Orange Cnty.*, 487 F.3d

1361, 1366 (11th Cir. 2007). An element of good cause is diligence prior to the

deadline. *See Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998)

(affirming the denial of leave to amend sought after the deadline: the "good cause

standard precludes modification unless the schedule cannot 'be met despite the

diligence of the party seeking the extension.'" (quoting Fed. R. Civ. P. 16 advisory

committee's note)); *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1241–43

(11th Cir. 2009) (affirming the denial of leave to amend based on lack of diligence

during discovery). Federal has not shown good cause. It could and should have

explored these issues early in the litigation.

　　　　To be sure, the plaintiffs amended their complaint after the deadline, on

March 2, 2021. The amendment more clearly asserted the plaintiffs' claim for

payment of the amount due, not just for an appraisal. But the original complaint

was already sufficient to assert the payment claim, and the amendment was ordered

on the court's own motion, not at the plaintiff's request, simply as a matter of

sound case management:

> As an exercise in sound case management, this order
> requires the plaintiffs to file an amended complaint explicitly
> setting out their breach-of-contract claim—their claim that the
> defendant has failed to pay the amount due as properly determined
> through appraisal. This will require the defendant to make clear in
> its answer the grounds on which it opposes the claim.

Order of Feb. 8, 2021, ECF No. 64, at 2. Having been afforded an opportunity "to make clear in its answer the grounds on which it opposes the claim," Federal said not a word about fraud.

After the appraisals were completed and Federal's plainly unfounded motion to vacate the structures award—on grounds not at issue here—the court set a new discovery deadline: November 24, 2021. The deadline to move for summary judgment was December 17, 2021. Federal belatedly served nonparty subpoenas returnable after the discovery deadline, and, remarkably, continued to obtain documents based on the subpoenas after an order was entered quashing them as untimely. Federal says it first learned of the alleged fraud from those documents.

That seems unlikely. The alleged fraud, though not alleged with particularity, was misrepresenting the condition of items that Federal's own expert had examined. Federal has not explained how, if the plaintiffs' expert was able to determine the condition of the items, Federal's expert could not have done so. Federal has not explained why, if Federal could infer fraud from the disparity between the plaintiffs' expert's analysis and the claim, Federal could not also infer fraud from the disparity between its own expert's analysis and the claim.

Federal has not shown good cause for the belated filing. The motion for leave to amend would be denied on this basis, without more. But there is more. Under Federal Rule of Civil Procedure 9(b), a pleading alleging fraud must "state

with particularity the circumstances constituting fraud." To meet this standard, a

pleading must set out:

>    (1) precisely what statements were made in what documents
>    or oral representations or what omissions were made, and
>
>    (2) the time and place of each such statement and the person
>    responsible for making (or, in the case of omissions, not making)
>    same, and
>
>    (3) the content of such statements and the manner in which
>    they misled the plaintiff, and
>
>    (4) what the defendants "obtained as a consequence of the
>    fraud."

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir.

1997) (quoting prior authorities).

Federal's proffered amendment misses the 9(b) standard by a wide margin.

The proposed answer's fraud defense, denominated the eleventh affirmative

defense, merely quotes the policy's fraud exclusion: "We do not provide coverage

if you or any covered person has intentionally concealed or misrepresented any

material fact relating to this policy before or after loss." ECF No. 125-1 at 22. The

defense does not allege the plaintiffs committed fraud at all, just that the policy

includes this provision. The defense does not allege the plaintiffs misrepresented

anything, not even generally, and thus does not allege "precisely what statements

were made in what document or oral representations." This is the very antithesis of

a pleading that would pass muster under Rule 9(b).

The law is unsettled as to whether an affirmative defense must include factual allegations as extensive as those required for a complaint. *See, e.g.*, *Southern-Owners Ins. Co. v. Whitley Contracting, Inc.*, No. 4:14CV106-RH/CAS, 2014 WL 11512364, at *1 (N.D. Fla. July 9, 2014). But whatever the standard, an affirmative defense needs more than this—and when asserting fraud, must comply with Rule 9(b). *See, e.g.*, *Hendley v. Am. Nat. Fire Ins. Co.*, 842 F.2d 267, 268–69 (11th Cir. 1988) (affirming district court's decision to strike a fraud defense that did not comply with Rule 9(b)). This defense is fatally deficient.

The counterclaim is better but still falls well short of the particularity required by Rule 9(b). Federal has submitted evidence identifying 49 items on which the plaintiffs allegedly inflated their claim. But the evidence is not part of the counterclaim. The counterclaim itself does not allege "precisely what statements were made" in "what documents or oral representations." The counterclaim does not allege the "time and place" or "persons responsible for the misstatements": was it the plaintiffs themselves or the public adjuster who Federal apparently asserts was their agent? The counterclaim does not allege how the misstatements misled it—an understandable omission because, on this record, it seems clear the misstatements did not mislead Federal at all. And the counterclaim does not allege what the plaintiffs "obtained as a consequence of the fraud"—again

an understandable omission because a ruling on the motion to vacate, as addressed

below, will ensure that the plaintiffs obtain nothing as a consequence of any fraud.

A party who submits a deficient pleading early in a case ordinarily is given

leave to amend. But Federal's proposed answer and counterclaim are already far

too late. Federal has not asserted that, if its proposed pleading is held deficient, it

should be given leave to try again. As a matter of discretion, this order denies the

motion for leave to amend and does not grant leave to file another proposed

amendment.

The denial of leave to amend makes it unnecessary to decide whether, if the

plaintiffs committed fraud as to the contents claim as Federal asserts, this would

preclude recovery on other contents items, or on structures, or even would allow

Federal to recoup amounts already paid. Although Florida law is not settled, it is

likely the fraud would preclude any further recovery on contents—even those

unaffected by the fraud—but would not preclude recovery on structures and would

not allow Federal to recoup prior payments. *Compare Schneer v. Allstate Indem.*

*Co.*, 767 So. 2d 485, 490 (Fla. 3d DCA 2000), *with id.* at 490–91 (Schwartz, J.,

dissenting); *see also Wong Ken v. State Farm Fire & Cas. Co.*, 685 So. 2d 1002,

1004 n.1 (Fla. 3d DCA 1997).

D. Motion to Vacate

As both sides apparently agree, appraisal is properly treated as a narrow, specialized form of arbitration. An award may be vacated on the grounds set out in Florida Statutes § 682.13. Federal invokes one such ground: that the award was procured by fraud. *Id*. § 682.13(1)(a).

The motion to vacate presents a genuine factual dispute as to the 49 items not covered by the Ironshore policy. The alleged fraud, if ultimately proven, could be a basis to vacate or reduce the contents award.

The plaintiffs say the motion to vacate was filed too late. A motion to vacate an award based on fraud must be filed "within 90 days after the ground is known or by the exercise of reasonable care would have been known by the movant." *Id*. § 682.13(2). Whether Federal used "reasonable care" after issuance of the award is a different question from whether Federal showed "good cause" to amend its answer or assert a counterclaim long after the deadline to amend pleadings. And the burden of proof is different: on the motion to vacate, the burden is on the plaintiffs to show lack of reasonable care, while on the motion for leave to amend, the burden is on Federal to show good cause. On this record, neither side has carried the burden. The result is that the motion to vacate must proceed to an evidentiary hearing, despite denial of the motion for leave to amend.

VII.    Conclusion

The appraisal awards determined the amount of loss caused by the covered peril—the hurricane's winds. The appraisal panel did not address additional coverage or limits issues, which must be resolved de novo in this litigation. No amount of lost rent is covered, resulting in a structures-award reduction of $1,200,000. The structures award exceeded the mold limit by $10,005.12. The structures award exceeded the limit for not-otherwise-covered tree-removal expense by $17,960.60. This leaves a net structures award of $5,018,060.10, calculated as the gross award of 6,246,025.82, less lost rent of 1,200,000.00, less excess mold remediation of 10,005.12, less excess tree removal of 17,960.60.

The contents award included $161,180 for items that, at least according to Federal, were included in the claim the plaintiffs submitted to Ironshore. But an item is not excluded from Federal's coverage just because the plaintiffs submitted a claim to Ironshore; the issue is whether the item was actually covered under the Ironshore policy. The second item on Federal's list consists of a table and chairs, with no showing these were in fact covered by Ironshore. This record may include sufficient information to allow calculation of the proper reduction of the contents award based on Ironshore coverage, but if so, the parties have not cited it. This order does not include a calculation.

Even aside from this issue, unresolved issues prevent entry of judgment on the contents award at this time. The unresolved issues are whether the plaintiffs failed to appear for reasonably requested EUOs or to produce reasonably requested documents; if so, whether Federal suffered prejudice as a result; and whether the plaintiffs committed fraud as to 49 non-Ironshore items included in the award. The EUO issues are part of the plaintiffs' claim and thus are triable to a jury. The fraud issue is part of Federal's motion to vacate and is triable to the court. This order requires the attorneys to confer on a schedule for these proceedings.

IT IS ORDERED:

1. The summary-judgment motions, ECF Nos. 126 and 128, are granted in part and denied in part.

2. The motion to vacate the contents appraisal award, ECF No. 138, is denied in part and remains pending in part.

3. The motion for leave to amend, ECF No. 125, is denied.

4. I do *not* direct the entry of judgment under Federal Rule of Civil Procedure 54(b).

5. The attorneys must confer and file a proposed schedule for further proceedings by July 11, 2022.

SO ORDERED on June 20, 2022.

s/Robert L. Hinkle
United States District Judge